UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
PATRICIA LYNCH,

                    Plaintiff,

           -against-

TOWN OF SOUTHAMPTON and
DONALD BAMBRICK, Individually and
in his Official Capacity,

                   Defendants.
------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

CV 05-4499 (ADS)

**APPEARANCES:**

> **LEEDS, MORELLI & BROWN, P.C.**
> Attorneys for the Plaintiff
> One Old Country Road
> Suite 347
> Carle Place, New York 11514
> By:    Steven A. Morelli, Esq., Of Counsel
>
> **DEVITT SPELLMAN BARRETT, LLP**
> Attorneys for the Defendants
> 50 Route 111
> Smithtown, New York 11787
> By:    Jeltje deJong, Esq.
>            David H. Arntsen, Esq.
>            Diane K. Farrell, Esq.
>            Of Counsel

**SPATT, District Judge.**

Following a jury trial and verdict, the defendant Town of Southampton (the

"defendant" or the "Town") moves (1) to vacate the jury award of $251,000 for plaintiff's

emotional distress damages in its entirety, or, in the alternative, (2) for a remittitur reflecting

an appropriate reduction of the amount of the verdict.

In addition, the plaintiff has moved for an order (1) for attorneys' fees pursuant to 42 U.S.C. § 1988 and (2) for costs and expenses. In this decision the Court will review the new rule set forth by the Second Circuit in the *Arbor Hill* case decided on April 24, 2007.

The Court will address each of these motions in order.

# I. <u>AS TO THE MOTION TO VACATE OR REDUCE THE AWARD FOR EMOTIONAL DISTRESS</u>

A)    <u>Background</u>

The plaintiff Patricia Lynch is a veteran print and network television journalist and author. She is the recipient of numerous awards, including two Emmys. Ms. Lynch is also an animal lover and has four dogs herself. In October 2000, she became a volunteer dog walker for the Town of Southampton Animal Control Shelter ("Animal Shelter"), without compensation. Thereafter, the plaintiff wrote letters to the Editor of the Southampton Press criticizing certain conditions and policies at the Animal Shelter. Over the course of the next few years, she continued to write letters to the Editor; participated in a radio show; and eventually filed a lawsuit about the Animal Shelter's euthanasia policies. All this time, Ms. Lynch continued to work as a volunteer dog walker for the Animal Shelter.

On February 27, 2004, after the plaintiff filed an order to show cause in support of a request for an injunction to stop the euthanasia policy, she was approached by two or three uniformed Town Code Enforcement Officers, was directed to leave, and she was immediately escorted out of the Animal Shelter.

In this Section 1983 First Amendment Freedom of Speech claim, on February 13, 2007, a jury verdict was rendered in favor of the plaintiff and against the Town of Southampton. The jury awarded damages to the plaintiff for emotional distress to the date of the verdict, in the sum of $251,000.

B)    The Contentions

Counsel for the defendant points out that "Ms. Lynch did not testify about treatment by a medical or mental professional." She contends that "plaintiff's distress caused by her love of dogs and the euthanizing of dogs is not distress which was caused by the termination of her services." Also, counsel emphasizes that there are no physical manifestations of her alleged emotional distress; there is no evidence regarding the duration of such condition; there is no corroboration by other witnesses or documentary evidence; and there is no difference in her life caused by the termination of her services, other than she no longer walks dogs at the shelter.

As to the law, counsel for the defendant cites cases where the awards for emotional distress were vacated and cases where the award was significantly reduced.

On the other hand, counsel for the plaintiff opposes the defendant's motions and asks that they be denied in their entirety. Counsel points to the manner in which the plaintiff, without prior notice, was escorted off the premises by the Town's uniformed officers and told never to return. The plaintiff testified that she was shocked and humiliated; that she feels helpless because she can no longer do some of the activities she previously enjoyed;

that she feels her career and reputation as a journalist were put in jeopardy; that she had to take medication after her termination; and that she was the subject of newspaper and television accounts of her termination, which humiliated her and hurt her reputation.

Counsel for the plaintiff concluded his presentation with the comment that, accordingly, this Court should, if it must, remit Lynch's damages award to no less than $175,000.

C) <u>The Evidence of Emotional Distress at the Trial</u>

In this case, the credible evidence of emotional distress starts with the method in which the Town of Southampton terminated the plaintiff's services as a volunteer animal dog walker. This was done shortly after the plaintiff filed an order to show cause for injunctive relief in her lawsuit against the Town.

Q After the filing of the order to show cause on the 24th of February did you go back to the shelter to volunteer?

A Yes.

Q When was the next time you went to volunteer at the shelter?

A I believe it was the day that I was removed physically.

Q And do you recall what day that was?

A That was Friday, let me see, Friday the 27th of February.

THE COURT: Of what year?

THE WITNESS: 2004, your Honor.

BY MR. MORELLI:

Q	What was your purpose in the animal shelter on February 27, 2004?

A	I did what I would ordinarily do, which is walk dogs.

Q	And did you walk any dogs on that date?

A	I did, Mr. Morelli.

Q	How many dogs did you walk?

A	To the best of my recollection I walked maybe two or three.

Q	And did something happen to stop you from walking other dogs?

A	Yes.

Q	What happened?

A	What happened was that some code enforcement officers wearing uniforms, either two or three, at least two or three and possibly at one point I thought it might have been four because I was so completely shocked at what was happened.

I had just finished walking a dog by the name of Gia and had taken her back to her pen and was prepared, I just asked permission to walk another dog, by the name of Patch, and got permission from Wendy Altieri, who was the vet tag, to walk that dog.

And I was ready to go inside to walk, to pick up Patch, who was being treated for ring worm, and before I could get a chance to go in, these men approached me. Very vigorously. Did not identify themselves initially.

I asked them who are you and do you have a business card? And one of them gave me a business card. And they told me that you must get off the premises immediately. And they handed me a piece of paper from Cheryl Kraft which basically said –

Q	Just tell us what happened first.

A	Okay. They hand me the piece of paper. I read the piece of paper.

It was clear what they were saying, which was get out of here and don't ever come back.  That was very specific.

Not stop volunteering.  It was you're not allowed on this premises ever again.  And I did not resist.  I instead – I had no phone with me or anything of that nature.

I went out to my car.  They followed me.  They took me to my car.  They made sure that I left.  And at that point, I don't know whether you want to hear what I, how I, what happened to me at that point.

Tr. at 132-133.[*]

The paper handed to the plaintiff that day at the Animal Shelter (Plt. Ex. 8) was signed by Cheryl Kraft, the Town's Public Safety Administrator, on February 26, 2004, the day before the plaintiff was terminated.   After thanking Ms. Lynch for her years of "volunteering and for the assistance you have given to the animal shelter in the past," the plaintiff was told: "Effective immediately all courtesies that have been previously afforded to you as a shelter volunteer are hereby revoked.  We are requesting that you immediately cease all visitations to the shelter."  (Tr. at 135-136).

Of importance in this discussion, the plaintiff's forced departure from the Animal Shelter was well covered by the media.

Q       Miss Lynch, prior to the break you were talking about the press that came about as a result of your being removed.  And I'm going to ask you if there were a number of press accounts of your removal from the facility.

A       Yes.

_____

*Tr. refers to the trial transcript.

6

Q       And where did those accounts appear?

They appeared on CableVision.  Channel 12.  Newsday.  Of course, the Southampton Press.  The Independent.  The Sag Harbor Express.  There was something in the Shelter Island that was sent to me.  It seemed to be seen by a lot of people.

Q       Did you foster any of this press coverage yourself?

A       No.

Q       How did this press coverage make you feel?

A       The humiliation that I felt as a professional was terrible.

I was put into a defensive position to try to explain what was going on, how something like this could happen.  I felt, the main thing that I felt was a hopelessness and a helplessness that I never felt working for network television, where I had some, I have the weight of a network behind me so I know that I could go after a Lynden LaRouch and do a story and have good results and change things.

Here was a situation where I was humiliated among my peers, a lot of them live on the South Fork, where I could do nothing to help the animals that I loved.

I adopted four shelter dogs, myself, excluding all the adoptions.  But it was mainly the feeling of helplessness and knowing that I could never go back there again to help them again.  And it was an awful experience.

I mean, I've had guns held on me by Lynden LaRouch when I did a television story, where I should have been afraid.  I wasn't afraid.  This to me was more poignant because of the fact these animals didn't have advocates.  And I was an advocate and I was a very good advocate for these animals.

And what happened to me was very unfair, and it was unfair to the animals.  It was unfair to me.  I couldn't fight back.  I was humiliated.  Absolutely humiliated.

Q       Now, Miss Lynch, do you believe that this press coverage and your

removal from the facility had an impact on your standing in the community?

A    Absolutely.

Tr. 142-144.

At this point in the trial the Court advised the jury that what people told Ms. Lynch is not admissible. It is hearsay. However, the Court also advised the jury that this testimony was being allowed "only on the issue of her emotional distress. In other words, what she felt and why she felt this after this situation; but not for the truth of what these people said. Only for the impact, if you find there is an impact on her." (Tr. at 145). The plaintiff then testified, as follows:

A    The impact on me personally, I am not a person who takes anything to deal with depression. And I for the first time tried to get some help in that area. This whole thing, because of how I felt about animals and what I knew I could never do again, disturbed me.

You have to remember how much of my life was devoted, during that time in 2000 to 2004, to writing letters, to, you know, writing columns to get the pleasure I got of seeing animals get homes; radio shows where I'd have people calling to get these animals taken care of. And not see them go off into a happy home. I mean, this was a wonderful feeling.

It was a chance to do something that was very good. And I knew I could never do it again. And I knew that if I tried to write a book about it, do a film about it, anybody that would be reading about my case would certainly question me as a person.

And that was terribly disturbing to me because I was totally sincere in what I did. I cared about the animals. That's the only reason I spent that much time doing what I did.

And it was, it was a horrible experience. And it went on. It's still going on. There are still questions that are raised –

8

\*   \*   \*   \*

I wanted to, I was trying to do a good thing for a good cause and I got a lot accomplished, and for it to end up in this letter from Cheryl Kraft banning me from ever walking into the facility, not just saying you can't volunteer, but saying you can never, ever even walk in here again; they're talking to a woman who got so many dogs adopted, found homes for animals that were going to be euthanized.  You can't imagine what it felt like.

\*   \*   \*   \*

So it was a real slap in the face.  And I felt dirty.  I felt dirty.

I felt why am I being asked?  You know is this true?  And how could this even come up?  How could this happen to me?

I mean, it was awful.  You don't know until you have experienced it. You could never understand it.  I cried a lot.  And it doesn't take much.  I didn't cry about Lynden LaRouch.  I cried about Jonestown because of those wonderful people who died there.  But it takes a lot to make me cry.

\*   \*   \*   \*

I don't know whether I'm making all this clear to you, but it was a terrible scene and I'm still on medication for it.  And my reputation within my community is a question mark for a lot of people.  There's no doubt about that.  And – is there any other question, Mr. Morelli, that I can make clear?

Tr. at 142-148.

It is apparent that a good part of Ms. Lynch's life revolved around her work as a volunteer at the Animal Shelter.  This part of her life was taken away from her and this apparently caused her considerable emotional distress and humiliation among her peers, a number of whom live on the South Fork.

Ms. Lynch also testified that, following her termination, she was on antidepressants.

She tried Paxil, Zoloft and "all the SSRIs" and the only one she could take is Klonopin. Also the Court notes that a contention by the defendant was that there was no evidence regarding the duration of her alleged emotional distress. In this regard, the Court notes that the plaintiff testified, as to her "horrible experience," that, "it's still going on." (Tr. at 146).

D)     <u>Discussion</u>

A district court may order a new trial limited to damages, or grant a remittitur by conditioning the denial of a defendant's motion for a new trial on the plaintiff accepting the reduction in damages, if the court finds that the damages awarded by the jury are excessive. *See Tingley Sys. v. Norse Sys.*, 49 F.3d 93, 96 (2d Cir. 1995). Remittitur describes "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984); *see also Cross v. New York City Transit Auth.*, 417 F.3d 24 (2d Cir. 2005); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 914-915 (2d Cir. 1997) (noting that a court may not reduce the damages without offering the prevailing party the option of a new trial).

The decision whether to grant a new trial following a jury trial under Fed. R. Civ. P. 59 is "committed to the sound discretion of the trial judge." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992). "This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148

F.3d 149, 165 (2d Cir. 1998).

Under federal law, an award will not be disturbed unless it is "so high as to shock the judicial conscience and constitute a denial of justice." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990); *accord Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

In *Annis v. County of Westchester,* 136 F.3d 239 (2d Cir. 1998) the recovery of damages for emotional distress was apparently limited in the Second Circuit. In *Annis*, a Section 1983 sex discrimination case, the jury awarded damages of $50,000 for emotional distress. On appeal, the ruling on the emotional distress damages issue could have become a significant barrier in future trials. The Court held that:

> Finally, we find that the only evidence of Annis's emotional distress – her own testimony – is insufficient to warrant an award of compensatory damages for that injury. She has not alleged any physical manifestations of her emotional distress, and, despite the discrimination, she remained a lieutenant with the County police. *Cf. Hetzel v. County of Prince William*, 89 F.3d 169, 171-73 (4th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S.Ct. 584, 136 L.Ed.2d 514 (1996). She testified that she needs and has had counseling, but introduced no affidavit or other evidence to corroborate her testimony. *Cf. Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1313-14 (7th Cir. 1983). In short, her testimony fails to establish that she suffers from any concrete emotional problems. *Cf. Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1250-54 (4th Cir. 1996) (citing cases), *cert. denied*, ___ U.S. ___, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997).

> Annis should be permitted to present other evidence of her emotional problems on remand.

However, other later Second Circuit decisions clarified the rule in *Annis*. In *Patrolmen's Benevolent Association of the City of New York v. The City of New York*, 310 F.3d 43, 55, 56 (2d Cir. 2002), the Court reiterated the well-established rule that emotional

distress damages may be awarded in Section 1983 cases.  It was also reiterated that the plaintiff must establish that "she suffered an actual injury caused by the deprivation."  The Court then went to state:

> The damage award "must be supported by competent evidence concerning the injury.  *Id. at 264, n. 20.*  A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages.  *See, e.g., Cohen v. Bd. of Educ., 728 F.2d 160, 162 (2 Cir. 1984); Annis v. County of Westchester, 136 F.3d 239, 249 (2d Cr. 1998). Cf Price v. City of Charlotte, 93 F.3d 1241, 1254 (4th Cir. 1996).*  Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress see *Miner, 999 F.2d at 663,* or the objective circumstances of the violation itself.  See id.; *Walz v. Town of Smithtown*, *46 F.3d 162, 170 (2d Cir. 1995).*  Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, see, [**32] e.g., *Carrero v. New York City Hous. Auth., 890 F.2d 569, 581 (2d Cir. 1989),* is not required.  *Miner, 999 F.2d at 663.*

Finally, in *Patrolmen's Benevolent*, the Court stated that "we agree that *Annis* should not be read to require physical symptoms of emotional distress in cases brought pursuant to 42 U.S.C. § 1983."  *See also Uddin v. New York City*, No. 99 Civ. 5843, 2001 U.S. Dist. Lexis 19373 at *18 (S.D.N.Y. 2001) ("District Courts have adopted this narrower reading of *Annis*").  In *Uddin,* an emotional distress verdict in the amount of $60,000, without medical corroboration, was approved.

In this case, reviewing the record, there is sufficient evidence of the plaintiff's emotional distress by objective circumstances, namely, the unexpected arrival of three uniformed officers who forced her to leave the Animal Shelter forthwith.  In addition, the publicity of her forced termination as a volunteer in the newspapers and on the radio, furnish

additional objective substantiation of humiliation and emotional distress on the part of the plaintiff. In sum, the Court finds that there was sufficient evidence to support an award of emotional distress to the plaintiff Patricia Lynch.

Having concluded that emotional distress damages were properly awarded, the Court may only reduce the award if the amount "shocks the conscience" of the Court. *Kirsch v. Fleet St., Ltd.,* 148 F.3d 149, 165 (2d Cir. 1998); *Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995); *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). While no two cases are exactly alike, a comparison of other cases is advisable and helpful to the Court in its determination as to whether the award of $251,000 to Ms. Lynch for emotional distress is so high as to "shock the judicial conscience." *Ismail*, 899 F.2d at 186.

In *Cross v. New York City Transit Authority*, 417 F.3d 241 (2d Cir. 2005), two demoted employees were each awarded $50,000 for mental and emotional distress. Even under the New York State law "deviates materially" standard, which "calls for closer surveillance than 'shock the conscience' oversight," *Gasperini v. Center for Humanities Inc.*, 518 U.S. 415, 424 (1996), the $50,000 award to each plaintiff was affirmed. In *Cross* the emotional distress sustained by the plaintiffs was substantially similar to that testified by Ms. Lynch; namely, ridicule, humiliation, anger and depression. In *Patrolman's Benevolent Association v. City of New York,* 310 F.2d 43 (2d Cir. 2002), an award of $50,000 for emotional distress to each of 22 plaintiffs was affirmed. In *Rainone v. Potter,* 388 F. Supp. 2d 120 (E.D.N.Y. 2005), a Title VII retaliation, failure to promote cause of action, with some

medical support, a verdict of $175,000 was reduced to $50,000. In *Norville v. Staten Island University Hospital*, No. 96-5222 Mem. & Order at 5-13 (E.D.N.Y. Oct. 20, 2003) aff'd, Nos. 03-9293, 04-0161, 2004 U.S. App. LEXIS 21034 (2d Cir. Oct. 8, 2004), the plaintiff testified to substantial emotional distress, corroborated by her sister and a clinical social worker, whom she visited once. The District Court remittitur order, affirmed on appeal, reduced the jury's emotional distress award for $575,000 to $30,000.

In another Second Circuit case involving the more stringent New York State rule, *Patterson v. Balsamico*, 440 F3d 104 (2d Cir. 2006), the jury awarded damages for emotional distress in the sum of $100,000. On appeal, the defendant contended that Patterson's injuries only amounted to "garden variety" emotional distress because the evidence of the harm suffered was limited to Patterson's testimony alone, and there was no evidence that any medical treatment was required. Thus, according to the defendant, the courts have limited compensatory damages in such cases to amounts below $30,000. The Second Circuit disagreed:

> This Court, however, has recently sustained an award of $125,000 for "subjective distress" not accompanied by medical treatment. *Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 77-78 (2d Cir. 2004), vacated on other grounds sub nom. *KAPL, Inc. V. Meacham,* 544 U.S. 957, 161 L.Ed.2d 596, 125 S. Ct. 1731 (2005). The Court in *Meacham*, in reviewing state court decisions to determine whether the district court had abused its discretion, found that New York courts, applying the material [**37] deviation standard of C.P.L.R. § 5501(c), "vary widely in the amount of damages awarded for mental anguish," but have upheld emotional distress "awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment." *Id.* at 78. This Court reaffirmed *Meacham's* holding on remittitur of damages in *Cross*, 417 F.3d at 258-59 & n.4.

14

\* \* \* \* \*

and on the basis of our finding in *Meacham* that New York courts have upheld awards of over $100,000 in comparable cases, we conclude that the district court did not abuse its discretion in declining to grant a remittitur.

Also in *Ginsberg v. Valhalla Anesthesia Associates*, No. 96 Civ. 6462, 1997 U.S. Dist. Lexis 16681 (S.D.N.Y. Oct 28, 1997), while the plaintiff presented little evidence regarding her emotional distress, she testified that she saw a psychiatrist, who did not testify, and received anti-depression medication, which she used for almost a year. The Court commented that this latter fact distinguished this case from the garden variety emotional distress cases in which the awards were remitted to from $20,000 to $50,000. The $500,000 award in *Ginsberg* was reduced to $100,000.

Another recent case is *Watson v. E. S. Sutton, Inc.,* No. 02 Civ 2739, 2005 U.S. Dist. Lexis 31578 (S.D.N.Y. Sept. 6, 2005), in which the plaintiff with no permanent psychological damage or disability, received a jury award of $500,000 for emotional distress. In a well reasoned opinion, after ruling that the award of $500,000 was excessive, Judge Wood stated:

> However, ESS's contention that "garden variety" emotional damage awards are in the range of $5,000 to $30,000 is also not persuasive, because those numbers appear to be at the low end of the range of damages generally awarded under New York law. "New York cases vary widely in the amount of damages awarded for mental anguish." *Cross v. New York City Transit Authority,* 417 F.3d 241, 259 (2d Cir. August 2, 2005) (quoting *Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 78 (2d Cir. 2004) certiorari granted on other grounds and judgment vacated by *KAPL, Inc. v. Meacham*, 544 U.S. 957, 125 S.Ct. 1731, 161 L. Ed. 2d 596 (Apr. 4, 2005)); *see also Cross*, 417 F.3d at 259 n.4 (reaffirming validity of Meacham remittitur holding). So

although ESS is correct that many decisions "reduce awards to [*46] $30,000 or below," *id.* (citing collection of decisions), others "uphold awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment," *id.* (citing collection of decisions). The Second Circuit in Meacham rejected a defendant's challenge to an order remitting an award for emotional damages to $125,000 in a case in which plaintiffs "had not offered evidence of treatment or physical sequelae," because that award did not "deviate substantially from verdicts awarded under similar circumstances." *Cross*, 417 F.3d at 259 (relying on Meacham to uphold jury award of $50,000).

The Court is confident that $500,000 is well outside the acceptable range of damages under the law. The range of acceptable [*47] damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000. As Watson's jury award for emotional distress deviates materially from that range, it cannot stand. Because the jury, and this Court, found that Watson suffered considerable distress, the Court is inclined to remit the award to $120,000, a value within the appropriate range that nevertheless reflects the jury's view that Watson's distress was considerable.

The Court finds that, based on a review of comparable cases and the evidence presented in this case, an award for compensatory damages in excess of $50,000 would shock the judicial conscience. The defendant's motion pursuant to Rule Fed.R.Civ.P. 59(e) is granted, and the Court will order a new trial on the issue of compensatory damages unless the plaintiff agrees no later than 20 days from the date of this opinion and order, in writing, to a remittitur reducing the emotional distress award to $50,000.

## II. AS TO THE MOTION BY PLAINTIFF'S COUNSEL FOR ATTORNEY'S FEES AND COSTS

### A) <u>Contentions</u>

The plaintiff's attorneys, Leeds, Morelli & Brown PC and the Law Office of Steven

A. Morelli request the following relief: (1) Prevailing Party attorneys' fees, pursuant to 42 U.S.C. § 1988 in the total sum of $136,033.33 ($50,445.83 for Leeds, Morelli & Brown and $85,587.50 for the Law Office of Steven A. Morelli), plus an upward adjustment in an amount the Court finds appropriate; and (2) costs in the sum of $582.40.

In his declaration in support of this fee application, Steven A. Morelli explains that the firm of Leeds, Morelli & Brown, P.C. was initially retained by the plaintiff on March 14, 2003. In March 2006 Steven A. Morelli left the firm of Leeds, Morelli & Brown, P.C. and formed another firm known as the Law Offices of Steven A. Morelli. However, Mr. Morelli remained of counsel to Leeds, Morelli & Brown, P.C. in the prosecution of this lawsuit. Further, in his declaration, Mr. Morelli states that the total hours spent on various tasks by the members of the firm as reflected in the attached time records, is a total of 556.08 hours. Also, the asserted reasonable hourly rates advanced by the attorney for the plaintiff is set forth in the plaintiff's Memorandum of Law as follows:

| Person Who Performed Work | Title | Billable Rate per Hour |
|---|---|---|
| Steven A. Morelli | Senior Partner | $ 350.00 |
| W. Matthew Groh | Associate | $ 300.00 |
| Nico DiLullo | Associate | $ 300.00 |
| Eric Tilton | Attorney awaiting admission | $ 200.00 |
| Shannon Hynes | Attorney awaiting admission | $ 200.00 |
| Sylvia Sweet | Para-professional | $125.00 |

In opposition, the defendant's counsel submits that (1) in a February 1, 2007 pre-motion conference before this Court, the plaintiff appeared by Eric Tilton, "a person who

was not admitted to the state or federal bar" and "an attorney from another firm who had little knowledge of the facts of this case, and who could not advance a settlement demand"; (2) plaintiff's Exhibit C which purports to list invoices sent to the plaintiff is not sufficient because "it lacks specificity regarding the identity of the person doing the work, or the time keeping"; (3) with regard to the February 1, 2007 conference, the plaintiff is requesting $500.00 for a fee for a non-admitted attorney and for an "attorney in waiting"; (4) a charge of $5,000.00 for the jury selection on February 5, 2007, which lasted less than four hours and was done by the Court's law clerk, is excessive; (5) the plaintiff's firm should not be entitled to charge for the services of two attorneys during the trial, especially when the second attorney, Eric Tilton, was not admitted in the state-federal courts; (6) the total fees charged for Messrs. Morelli and Tilton for trial preparation and at the trial in the sum of $26,987.50 is grossly excessive "for what amounts to five days of trial" and "reflects excessive hours, redundant staffing and excessive hourly rates"; (7) the hourly rates charged are excessive in that the "plaintiff's firm is seeking to charge city rates while trying the case in Suffolk", and the proposed hourly fee schedule "is in fact unconscionable"; (8) the plaintiff withdrew two of her claims at the end of trial and prevailed only on the first amendment claim; and (9) the jury found in favor of co-defendant Donald Bambrick.

    B)    <u>Discussion</u>

        1. <u>Pre-Arbor Hill</u>

Here, the plaintiff Patricia Lynch is a prevailing party who is entitled to attorney's

fees because the jury rendered a verdict in her favor on her Federal First Amendment Freedom of Speech cause of action and awarded her damages for emotional distress.

To calculate attorneys' fees, until very recently, the Courts in the Second Circuit and elsewhere used the "lodestar" method to determine the reasonableness of attorney's fees. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986). Under that method, a court makes an initial calculation of a lodestar amount by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 784, 763-764 (2d Cir. 1998); *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997). If the court finds that certain claimed hours are excessive, redundant, or otherwise unnecessary, it should exclude those hours from its lodestar calculation. *Luciano*, 109 F.3d at 116. After the initial lodestar calculation is made, the court should then consider whether a downward adjustment is warranted by a factor as to the extent of success in the litigation. *Hensley*, 461 U.S. at 434 & n.9, (citation omitted).

2. <u>Arbor Hill - the Presumptively Reasonable Fee</u>

On April 24, 2007, the Second Circuit decided the case of *Arbor Hill Concerned Citizens Neighborhood Assoc., et al. v. County of Albany et al.*, No. 06-0086, 2007 U.S. App. LEXIS 9300 (Apr. 24, 2007). This was a case brought under the Voting Rights Act of 1965. The plaintiff appealed from an award of attorneys' fees in which the district court applied

the so-called "forum rule," namely an hourly rate charged by the attorneys in the district where the district court presides.

In this decision, Judge Walker stated that the "fee-setting jurisprudence has become needlessly confused – it has come untethered from the free market it is meant to approximate" and so:

> We therefore suggest that the district court consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay, not just in deciding whether to use an out-of-district hourly rate in its fee calculation.

> * * * *

> The district court must act later to ensure that the attorney does not recoup fees that the market would not otherwise bear. Indeed, the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively.

*Arbor Hill*, 2007 U.S. App. LEXIS at *3

Referring to the fact that in the Northern District law suit, plaintiff's counsel had their office in Manhattan, the Court declined to award rates charged by attorneys in the Southern District:

> Indeed, we believe that a reasonable, paying resident of Albany would have made a greater effort to retain an attorney practicing in the Northern District of New York, whether in Syracuse, Binghamton, Utica, or Kingston, than did plaintiffs. The rates charged by attorneys practicing in the Southern District of New York would simply have been too high for a thrifty, hypothetical client – at least in comparison to the rates charged by local attorneys, with which he would have been familiar.

*Id.* at *4-5

In a review of the history of attorney's fee awards in the United States, the Court in *Arbor Hill* stated that Congress implicitly endorsed two existing methods of calculating the "reasonable fee" that were developed by the Circuit Courts in the 1970s. *Id.* at *8-9. The first was the "lodestar" method, namely, the product of the "attorney's usual hourly rate and the number of hours worked." *Id.* at *9. After determining the lodestar, the district court could adjust it "based on case-specific considerations." *Id.*

"The second method, developed by the Fifth Circuit, was for district courts to consider twelve specified factors to establish a reasonable fee." *Arbor Hill,* 2007 U.S. App. at *9 (citing *Johnson v. Ga. Highway Express Inc.*, 488 F.2d 714 (5th Cir. 1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 92, 93, 96 (1989)). "The *Johnson* method differed from the lodestar method in that it contemplated a one-step inquiry." *Id.* The Court also stated that "[t]he Supreme Court adopted the lodestar method in principle, *see Hensley*, 461 U.S. at 433; *Blum v. Stenson*, 465 U.S. 886 (1984), without, however, fully abandoning the *Johnson* method." *Id.* at *13.

The Court in *Arbor Hill*, went on to relate that the "Supreme Court has not yet fully resolved the relationship between the two methods" and "our court has done little to resolve this confusion." *Id.* at *16-17. The Court then determined that:

> The "lodestar" is no longer in the true sense of the word – "a star that leads," *Webster's Third International Dictionary* 1329 (1981).
>
> * * * * *

What the district courts in this circuit produce is in effect not a lodestar as

originally conceived, but rather a "presumptively reasonable fee."

*Id.* at *19.

Then, significantly, the Second Circuit appears to recommend a shift from the lodestar method to a "reasonable hourly rate", meaning "the rate a paying client would be willing to pay":

> The meaning of the term "lodestar" has shifted overtime, and its value as a metaphor has deteriorated to the point of unhelpfulness. <u>This opinion abandons its use</u>. We think the better course – and the one most consistent with attorney's fees jurisprudence – is for the district court, in exercising its considerable discretion, to bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. <u>The reasonable hourly rate is the rate a paying client would be willing to pay</u>. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee." (Emphasis supplied).

FN:  While we do not purport to require future panels of this court to abandon the term – it is too well entrenched – this panel believes that it is a term whose time has come.

*Id*. at *20-21.

### 3. The Forum Rule

The Supreme Court directed that district courts should use the prevailing market rates in the community, in calculating the lodestar, or what the Second Circuit is now calling the "presumptively reasonable fee." (*See Blum v. Stenson*, 465 U.S. at 895).

In *Polk v. N.Y. State Dep't of Corr. Serv.*, 722 F2d 23, 25 (2d Cir. 1983) it was determined that the "community" is the district in which the court sits. However, the courts have not adhered to a strict forum rule. *Arbor Hill*, 2007 U.S. App. LEXIS at *22. It is still the rule that the district courts should award fees high enough to attract competent counsel. *Lewis v. Coughlin,* 801 F.2d 570, 576 (2d Cir. 1986). Any confusion as to the forum rate was resolved in *Arbor Hill,* by applying the new standard, namely, "what a reasonable paying client would be willing to pay."

> We now clarify that a district court may use an out-of-district hourly rate – or some rate in between the out-of-district rate sought and the rates charged by local attorneys – in calculating the presumptively reasonable fee <u>if it is clear that a reasonable, paying client would have paid those higher rates</u>. We presume, however, that a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally. This presumption may be rebutted – albeit only in the unusual case – if the party wishing the district court to use a higher rate demonstrates that his or her retention of an out-of-district attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill. (Emphasis supplied).

*Arbor Hill*, 2007 U.S. App. Lexis, at *24.

### 4. <u>As to the Hourly Rate</u>

It is now the Court's obligation to determine the "presumptively reasonable fee" in this case. Initially, the Court must comment on the level of legal services rendered by the attorneys on both sides. The advocacy at trial of Steven A. Morelli for the plaintiff and Jeltje deJong for the defendant, was outstanding. Both trial lawyers were well prepared, conscientious, diligent and, equally important, courteous and ethical in dealing with each

other.  In addition, their post trial submissions were well written, relevant and helpful.

Now as to the proper "presumptively reasonable fee" in the Eastern District community.  Plaintiff's counsel Steven A. Morelli affirms that he has been a litigator in State and Federal courts in the civil rights and employment discrimination fields for more than twenty years; has tried a number of employment/civil rights cases in the federal court; and has been called upon as an expert in discrimination cases in various television and radio shows.  The court finds that he is well qualified in the civil rights field.

As stated above, in determining the presumptively reasonable hourly rate, the "community" to which the district court should look to is the district in which the court sits.  *See Arbor Hill*, 2007 U.S. App. Lexis at *22*; Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir. 1994).

In 1998, the Second Circuit held that hourly rates of $200 for partners, $135 for associates, and $50 for paralegals were reasonable rates for legal services in the Eastern District.  *Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d. Cir. 1998); *see also Luciano*, 109 F.3d at 111-12 (collecting cases); *Association for Retarded Citizens v. Thorne*, 68 F.3d 547, 554 (2d Cir. 1995); *Cruz*, 34 F.3d at 1160.  Initially, the Court will consider the rates prevailing in the Eastern District community for similar services by lawyers of reasonably comparable skill, experience, and reputation in making the initial presumptively reasonable fee calculation.

Some Eastern District Courts have followed the rational set forth in *Savino*.  *See Fink*

*v. City of New York*, 154 F. Supp. 2d 405, 407 (E.D.N.Y. 2001) (partners $200.00 to $250.00 and associates $100.00 to $200.00); *Schwartz v. Chan*, 142 F. Supp. 2d 325 (E.D.N.Y. 2001) ($175.00 per hour for a sole practitioner); *Fernandes v. North Shore Orthopedic Surgery & Sports Medicine*, 2000 WL 13063, at *8 (E.D.N.Y. 2000) ($225.00 per hour for partners and $100.00 per hour for associates); *Cush-Crawford v. Adchem Corp.,* 94 F. Supp. 2d 294, 303 (E.D.N.Y. 2000) aff'd, 271 F.3d 352 (2d Cir. 2001) ($200.00 for partners and $135.00 for associates); *Greenridge v. Mundo Shipping Corp.,* 60 F. Supp. 2d 10, 13 (E.D.N.Y. 1999) ($225.00 per hour for a senior partner and $150.00 per hour for her associate).

To this initial review, the Court must now determine what a reasonable paying client would be willing to pay; that is "stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively." Arbor Hill, 2007 U.S. App. LEXIS at *3.

If a $200.00 per hour fee was held to be reasonable in 1998 almost ten years ago, *see Savino*, and $225.00 per hour, held reasonable in 2000, *see Fernandez;* with reasonable certainty, in 2007, the hourly fee of $250.00 would be fair and reasonable. Also, in the Court's view, even for an attorney of the stature of Steven Morelli, a client wishing to pay the least amount necessary to litigate the case effectively; that hourly rate is a fee that a reasonable paying client would be willing to pay.

Accordingly, after considering all the factors in *Hensley & Johnson*, and after adhering to the new *Arbor Hill* standard, the Court fixes the hourly compensation of Steven

Morelli at $250.00.  Also, as to the other persons, lawyers and others, who performed work, bearing in mind the rulings in *Savino* of $135.00 for associates and $50.00 for paralegals, in 1998, and in *Greenridge* of $150.00 for associates in 1999 and *Fink*, $100.00 to $200.00 for associates in 2001, the Court finds that their presumptively reasonable fees, and what a reasonable client wishing to pay the least amount necessary to these persons who worked under the direction of Mr. Morelli, the Court fixes their hourly compensation as follows:

| Person Who Performed Work | Title | Billable Rate per Hour |
|---|---|---|
| Steven A. Morelli | Senior Partner | $ 250.00 |
| W. Matthew Groh | Associate | $ 150.00 |
| Nico DiLullo | Associate | $ 150.00 |
| Eric Tilton | Attorney awaiting admission | $ 100.00 |
| Shannon Hynes | Attorney awaiting admission | $ 100.00 |
| Sylvia Sweet | Para-professional | $   75.00 |

The Court declines to grant Mr. Morelli's belated request, contained in his reply papers, for attorneys' fees  for interns who worked on this matter.

5. As to the Alleged Unnecessary Hours

An important factor in the determination of a "presumptively reasonable fee," is the number of hours reasonably expended.  In *Hensley* the Court stated that the district court should exclude from the fee calculation hours that were not "reasonably expended," as follows:

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended."  S. Re. No. 94-1011, p.6 (1976). . . . Counsel for the prevailing party should make a good-faith effort to exclude

> from a fee request hours that are excessive, redundant, or otherwise
> unnecessary, just as a lawyer in private practice ethically is obligated to
> exclude such hours from his fee submission. "In the private sector, 'billing
> judgment' is an important component in fee setting. It is no less important
> here. Hours that are not properly billed to one's <u>client</u> also are not properly
> billed to one's <u>adversary</u> pursuant to statutory authority." *Copeland v.*
> *Marshall*, 641 F.2d 880, 891 (1980).

461 U.S. at 434, 63 S. Ct. 1937 (emphasis supplied).

The defendant contends that the Leeds, Morelli & Brown firm and in particular, attorney Groh billed approximately 75 hours to the preparation, revision and finalization of the complaint. The Court notes that in the plaintiff's Reply Declaration, the number of hours for the initial intake, drafting the complaint and meetings and e-mails with the client regarding the complaint is 97.83 hours. Counsel for the defendant cites to *Jennette v. City of New York*, 800 F. Supp. 1165 (S.D.N.Y. 1992) in which the court found that 24 hours allocated to the preparation of the complaint, which consisted of 21 pages of text and sets forth a detailed account of the plaintiff's claims, was reasonable. Here, the complaint was 43 pages and set forth three causes of action, two of which were ultimately not pursued. In this Court's view, the 97.83 hours for the intake and preparation of the complaint was excessive. Allocating four full days at eight hours per day or thirty-two hours, would be sufficient. *See King v. Northern Bay Contractors Inc.*, No. 05-CV-2080, 2006 WL 3335118 (E.D.N.Y. Oct. 25, 2006) ("the court concludes that 3.25 hours is not an unreasonable amount to spend initiating suit in the District Court.")

Also, the defendant objects to the $500.00 fee for the premotion/settlement

conference of February 1, 2007, because the plaintiff was represented by Eric Tilton, who, at this time, was not admitted to the state or federal bar. The Court agrees and will not direct reimbursement for this event.

In addition, the defendant objects to the plaintiff's trial preparation and trial charges, which include Steven Morelli and the attorney awaiting admission. The defendant asserts that "plaintiff's firm should not be entitled to charge for the services of two attorneys in the case." In particular, the defendant objects to Eric Tilton's participation in the trial, as a non-admitted attorney, who, allegedly, kept track of exhibits but did not otherwise participate at the trial. The defendant asserts that the total fees proposed to be charged for Mr. Morelli and Mr. Tilton for trial preparation and trial is the sum of $26,987.50, which is "grossly excessive for what amounts to 5 days of trial." In sum, in addition to complaining about the non-admitted attorney, the defendant contends that only one attorney was required for this trial and, therefore, excessive hours have been charged. The Court disagrees.

Other than a reduction in the hourly rates of both Mr. Morelli and Mr. Tilton, as set forth above, the Court declines to reduce the fee for the use of both men during the trial. It is reasonable and somewhat customary, that a trial attorney be assisted in the preparation and trial of the case. While some trial lawyers work unassisted – and prefer to do so – it is not unreasonable to have assistance in the preparation of witnesses and the handling of exhibits and transcripts during the trial. Therefore, the defendant's request to eliminate Mr. Tilton's services prior and during the trial or to reduce the number of trial hours, is denied.

Finally, in regard to the hours listed by plaintiff's counsel, the defendant objects to certain hours of unspecified research, unspecified automatic disclosure and telephone conversations with the plaintiff. Upon a review of the plaintiff's submission, including the Reply declaration in further support of plaintiff's post-trial motions, the Court concludes that the records of the work done, the hours billed and the respective persons who did the work are legally sufficient.

In sum, the Court will make the following reduction in hours:

1) As to the intake and the preparation of
   the complaint –                          97.3 hours billed reduced to 32 hours

2) Representation at the pre-motion
   conference by a non-admitted attorney –   $500 charged to be deleted.

6. <u>As to the Degree of Success</u>

In the complaint, the plaintiff alleged that the defendants violated her First Amendment right to free speech; her equal protection rights; her due process rights; and that the defendants conspired to harass and retaliate against her. However, on February 6, 2007, after the jury was selected and just prior to the opening statements, the plaintiff withdrew all of her claims with the exception of the First Amendment claim. In addition, the plaintiff brought this action against both the Town of Southampton and her supervisor Donald Bambrick. The jury found in favor of the plaintiff against the Town, but also found in favor of the defendant Donald Bambrick. Based on these events, the defendant contends that the attorneys' fees should be reduced downward "by at least 10% based upon Bambrick's

success in this case" and also reduced as a result of the three withdrawn causes of action.

As the Supreme Court stated in *Hensley*, the results obtained factor is "particularly crucial where a plaintiff is deemed prevailing" when she did not succeed in all her claims of relief.  461 U.S.  at 430, 434 & 440.   However, in *Dominic v. Consolidated Edison Company of New York Inc.,* 822 F.2d 1249, 1259 (2d Cir. 1987), the Second Circuit enunciated the doctrine of "substantial related and intertwined claims."  In *Dominic,* the Court held:

> [T]he factual and legal theories underlying Dominic's age discrimination claim were inextricably intertwined with those underlying his retaliatory discharge claim.  Consequently, a fully compensatory fee award was justified because Dominic recovered the same relief on the retaliation claim that he would have on his discrimination claim.

822 F.2d at 1259; *see also Reed v. A. W. Lawrence & Co.,* 95 F.3d 1170, 1183 (2d Cir. 1996) ("Where the district court determines that the successful and unsuccessful claims are 'inextricably intertwined' and 'involve a common core of facts of [are] based on related legal theories,' it is not an abuse of discretion for the court to award the entire fee.")

In the seminal *Henley* case it was stated:

> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories.  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Henley*, 461 U.S. at 434-37.

In *Pinner v. Bridget Mortgage Bankers Ltd.,* 336 F. Supp. 2d 217 (E.D.N.Y. 2004), aff'd, 169 Fed App. 599 (2006) it was held:

> The Court finds that the withdrawn Title VII religious and gender discrimination claims were unrelated to the successful retaliation claim. However, the Court also finds that the failed sexual harassment-hostile work environment claim and the successful retaliation claim are related and inextricably linked. Therefore, the Court will make a reduction of five percent for the two withdrawn causes.

> In addition, the Court further finds that the plaintiff's degree of success on the interrelated successful and unsuccessful claims, does not warrant a reduction on the fee award for those claims.

336 F. Supp. 2d at 222.

In *Separ v. Nassau County Dept. of Social Services,* 327 F. Supp. 2d 187, 192 (E.D.N.Y. 2004), the "plaintiff originally pled several causes of action but failed to submit any material evidence in support . . . [and this] resulted in dismissal of those claims at the close of the plaintiff's case [and] . . . achieved only limited success," which required a 40% reduction. In *Hine v. Maneta,* 253 F. Supp. 464, 467 (E.D.N.Y. 2003), there was a "lack of success on two of the three causes of action" and the jury awarded no damages for emotional distress and back pay. This Court reduced the attorney's fees by 60%. Also, in *Coffey v. Dobbs International Services Inc.,* 5 F. Supp. 2d 79, 86 (N.D.N.Y. 1998), rev'd on other grounds, 170 F.3d 323 (2d Cir. 1999), the Court held that the harassment and retaliation claims were related, but it reduced the fee by 20 percent because the plaintiff was "unsuccessful as to every other claim, largely due to his failure to prove damages."

Here, the plaintiff was unable to proceed with the due process, equal protection and

conspiracy causes of action. In addition, the plaintiff did not prevail against the individual defendant Donald Bambrick, which meant no opportunity to receive punitive damages. Therefore the plaintiff did not succeed in all her claims for relief. Accordingly, a reduction of ten percent in the plaintiff's counsel fee is appropriate.

## III. CONCLUSIONS

In sum, the Court makes the following determinations:

1) The defendant's motion pursuant to Rule 59(e) to vacate the jury's award of $251,000 for plaintiff's emotional distress in its entirety or, in the alternative for a remittitur reflecting an appropriate reduction of the amount of the verdict, is granted to the extent that the Court will order a new trial on the issue of compensatory damages unless the plaintiff agrees no later than 20 days from the date of this opinion and order, in writing, to a remittitur reducing the award to $50,000.

2) The motion by the plaintiff's counsel for attorneys' fees and costs is granted to the following extent:

a) Prevailing party attorneys' fees are awarded for a total of 476.75 hours. This figure is arrived at as follows:

| | |
|---|---|
| Total hours claimed | 556.58 |
| Less 65.83 hours with regard to intake and preparation of the complaint | 65.83 |
| Less 14.00 hours with regard to work performed by interns | 14.00 |

Net allowable hours         476.75

b) The presumptively reasonable hourly fees, as determined by the Court and the respective hours for each participant, are as follows:

| Person Who Performed Work | Title | Billable Rate per Hour | Number of Hours worked | Fee |
|---|---|---|---|---|
| Steven A. Morelli | Senior Partner | $ 250.00 | 216.50 | $54,125.00 |
| W. Matthew Groh | Associate | $ 150.00 | 52.58 | 7,887.00 |
| Nico DiLullo | Associate | $ 150.00 | 2 | 300.00 |
| Eric Tilton | Attorney awaiting admission | $ 100.00 | 72.17 | 7,217.00 |
| Shannon Hayes | Attorney awaiting admission | $100.00 | 12 | 1,200.00 |
| Sylvia Sweet | Para-professional | $ 75.00 | 120.50 | 9,037.50 |
| Kerry Shannon | Legal Assistant | $ 75.00 | 1 | 75.00 |

Total Hours:      Total Gross Fee:
476.75         $79,841.50

c) From this total gross fee there shall be the following deductions.

Total Gross Fee         $79,841.50
Less $500.00         $    500.00
        $79,341.50
Less 10%  - by reasons of the
   unsuccessful claims         $  7,934.15

Total net fee         $71,407.35

d) The plaintiff's counsel will also recover costs and expenses in the amount of $582.40.

Upon the receipt of a written notice from the attorneys for the plaintiff that she has accepted the remittitur reducing her award for emotional distress to $50,000, the Clerk of the

33

Court is directed to enter judgment in accordance with this decision and order.

In the event that the plaintiff does not file a written acceptance of the remittitur within twenty days of the date of this opinion and order, a new trial solely on the issue of damages for emotional distress will commence on a date to be set by the Court.

**SO ORDERED:**

Dated: Central Islip, New York
June 27, 2007

_____*/s/ Arthur D. Spatt*_____
Arthur D. Spatt
United States District Judge